**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BARRY O'CONNOR, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>AVIS BUDGET GROUP, INC., JOSEPH A. FERRARO, and IZILDA P. MARTINS,<br><br>        Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Barry O'Connor ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, public filings, wire and press releases published by and regarding Avis Budget Group, Inc. ("Avis Budget" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Avis Budget securities between February 13, 2024 and February 10, 2025, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

_____

[1] Unless otherwise stated, all emphasis is added.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Avis Budget securities during the Class Period and was economically damaged thereby.

3

7.     Avis Budget is incorporated in Delaware and its headquarters are located at 379 Interpace Parkway, Parsippany, New Jersey 06054 Avis Budget's common stock trades on the Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "CAR".

8.     Avis Budget, together with its subsidiaries, provides car and truck rentals, car sharing, and ancillary products and services to businesses and consumers in the Americas, Europe, the Middle East and Africa, Asia, and Australasia. Among other services, the Company operates the Avis brand, which offers vehicle rental and other mobility solutions to commercial and leisure segments of the travel industry; the Zipcar brand, a car sharing network; and the Budget brand, a supplier of vehicle rental and other mobility solutions focused primarily on more value-conscious customers. According to the Company, its global rental fleet totaled approximately 695,000 vehicles in 2024.

9.     With hundreds of thousands of vehicles in its rental fleet, effective fleet management is critical to Avis Budget's profitability. This includes, among other things, ensuring proper fleet rotation—*i.e.*, the replacement of older vehicles in a rental fleet with newer models. To execute this process effectively, a company must rotate its vehicles at an appropriate pace. If rotation is too gradual, older models may begin depreciating in value even as their maintenance costs steadily increase. Conversely, if rotation is too accelerated, a company risks prematurely removing

vehicles before they have reached the end of their "useful lives"—the period during which the vehicles have recoverable value.

10.    In discussing the significance of fleet rotation to its business and profitability, Avis Budget has stated that "[h]ow you buy cars and deliver them into your business and then exit cars out at the proper time at the right place is extremely critical" and, when analyzing buying and selling fleet vehicles, "one of the more important and overlooked aspects is how you rotate your fleet" given that "it allows you to have or maintain a certain age level or mileage level that is both operationally prudent from an efficiency standpoint as it turns out to be in light vehicle costs as well as from a customer acceptance. ***And we've been doing that***."

11.    In the years following the Covid-19 pandemic, due to a shortage of fleet supply, automobile rental companies were required to purchase fleet vehicles at higher prices than historic norms. To address this challenge, Avis Budget decelerated its fleet rotation by maintaining vehicles within its rental fleet for a longer period of time. As the Company stated in an earnings call held with investors and analysts to discuss its Q4 2024 results (the "Q4 2024 Earnings Call"), this practice purportedly "allowed [the Company] to depreciate vehicles across a flatter portion of the residual value curve and manage [its] fleet purchase to an appropriate return on invested capital."

12.    However, in the fourth quarter of 2024, prices for vehicles model year 2025 began returning to normalized levels. In response, unbeknownst to investors, Avis Budget implemented a "change in strategy to significantly accelerate fleet rotations," purportedly designed to "create more certainty in [Avis Budget's] fleet costs and better position [the Company] for sustainable growth for 2025 and beyond."

13.    On February 11, 2025, Avis Budget issued a press release reporting its financial results for the fourth quarter and full year 2024. Among other items, Avis Budget reported a loss of $1.96 billion, or $55.66 per share, for the quarter, compared to a profit of $259 million, or $7.10 per share, for the same period in the prior year. Avis Budget attributed these results to "a change in strategy to significantly accelerate fleet rotations, which resulted in shortening the useful life of the majority of our vehicles in the Americas segment[,]" causing "a one-time non-cash impairment of $2.3 billion and other non-cash related charges of $180 million."

14.    The press release also announced that the Company's Chief Executive Officer ("CEO"), Defendant Joseph A. Ferraro ("Ferraro"), "will transition from CEO to Board Advisor, effective June 30, 2025" and that "Brian Choi, the Company's Chief Transformation Officer, will take over as CEO, effective July 1, 2025."

15.     On this news, Avis Budget's stock price fell $6.12 per share, or 6.82%, to close at $83.59 per share on February 11, 2025.

16.     Defendant Ferraro served as Avis Budget's Chief Executive Officer ("CEO") and President at all relevant times.

17.     Defendant Izilda P. Martins ("Martins") served as the Company's Chief Financial Officer ("CFO") at all relevant times.

18.     Defendants Ferraro and Martins are collectively referred to herein as the "Individual Defendants."

19.     Each of the Individual Defendants:

   (a)     directly participated in the management of the Company;

   (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

   (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

   (d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   (e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

20.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

21.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

22.    The Company and the Individual Defendants are collectively referred to herein as "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

23.    On February 13, 2024, before the market opened, Avis Budget held its Q4 2023 Earnings Call (the "Q4 2023 Call"). Defendant Ferraro made the following statement on the Q4 2023 Call:

> As I stated in past earnings calls*, fleet rotation and cycling of fleet is a critical element of fleet management*. This addresses mileage and age as we bring in new vehicles, ***while disposing of older units and creating a stabilization of cost and utilization over time***.

8

*We did this throughout this past year and into the fourth quarter and we'll continue to do this throughout the first quarter and balance of this year as we ensure our fleets are in line with demand creating stability in our fleet management*. There continues to be demand for vehicles of our type as used cars still represent a value to consumers at a price point of some $20,000 less than a new vehicle.

\*     \*     \*

I said this the last time, but I feel it important to reiterate, an environment where our core input costs are rising, both the cost of vehicles and the cost to finance we must be hyper-vigilant in matching our vehicle supply to just under demand and this year, it's more important than ever.

24.    On February 16, 2024, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Ferrari and Martins attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

25.    The 2023 Annual Report contained the following statement about the Company's strategy:

*For 2024, we expect our strategy to continue to primarily focus on customer experience and costs to strengthen our Company, maximize profitability, and deliver stakeholder value*. To execute our strategy, we expect to continue to leverage marketing and invest in technology and infrastructure to support our vehicle related rentals. *With respect to costs, we aim to achieve operational excellence and invest strategically to lower costs over the long*

*term*.

26.    Further, the 2023 Annual Report purported to warn that "[e]arnings for future periods *may* be impacted by impairment charges for goodwill and intangible assets[,]" while downplaying the risk of the same, stating, in relevant part:

> We assess goodwill and indefinite-lived intangible assets for impairment each year, or more frequently if circumstances suggest an impairment may have occurred. We have determined in the past and *may* again determine in the future that a significant impairment has occurred in the value of our goodwill. Additionally, we have a significant amount of identifiable intangible assets and fixed assets that *could* also be subject to impairment. *If* we determine that a significant impairment has occurred in the value of our unamortized intangible assets or fixed assets, we *could* be required to write off a portion of our assets, which *could* adversely affect our consolidated financial condition or our reported results of operations.

27.    The foregoing risk warnings were generic, catch-all provisions that were not tailored to Defendants' actual known risks regarding the likelihood of Avis Budget recognizing a material impairment charge in the near future.

28.    On May 2, 2024, Avis Budget filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2024 (the "1Q24 Report"). Attached to the 1Q24 Report were certifications pursuant to SOX signed by Defendants Ferraro and Martins attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

29.    The 1Q24 Report contained a substantively similar description of the Company's strategy, as discussed in ¶ 25.

30.    Further, in listing "factors and assumptions [that] ***could*** affect [Avis Budget's] future results," the Q1 2024 included, among others:

- a change in our fleet costs, including as a result of a change in the cost of new vehicles, resulting from inflation or otherwise, manufacturer recalls, disruption in the supply of new vehicles, including due to labor actions or otherwise, shortages in semiconductors used in new vehicle production, and/or a change in the price at which we dispose of used vehicles either in the used vehicle market or under repurchase or guaranteed depreciation programs;

\*        \*        \*

- Our ability to successfully implement or achieve our business plans and strategies, achieve and maintain cost savings and adapt our business to changes in mobility[.]

31.    Plainly, the foregoing warnings were generic, catch-all provisions that were not tailored to Defendants' actual known risks regarding the likelihood of Avis Budget recognizing a material impairment charge in the near future.

32.    On August 6, 2024, Avis Budget filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2024 (the "2Q24 Report"). Attached to the 2Q24 Report were certifications pursuant to SOX signed by Defendants Ferraro and Martins attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

33.    The 2Q24 Report included a substantively similar description of the Company's strategy as discussed, *supra*, in ¶ 25, and substantively similar generic,

catch-all warnings that were not tailored to Defendants' actual known risks, as discussed herein at ¶ 30.

34.     On October 31, 2024, Avis Budget issued a press release announcing the Company's Q3 2024 results. The press release stated, in relevant part:

> "We maintained a strong focus on pricing throughout the quarter, prioritizing higher margin business which allowed us to keep our revenue per day stable with the Americas nearly flat," said [Defendant] Ferraro[.] "Vehicle utilization improved by approximately 2 points throughout the Company as we exercised strong fleet discipline. Our U.S. model year 2025 buy is well underway and expected to drive significant savings as these vehicles are rotated into our fleet. Lastly, the holidays look strong, and we believe we are well positioned to capitalize on this demand."

35.     Conspicuously, the foregoing positive statements regarding the rotation of model year 2025 vehicles into the Company's fleet failed to acknowledge the likelihood of Avis Budget recognizing a significant impairment charge in the near future.

36.     On November 1, 2024, Avis Budget filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2024 (the "3Q24 Report"). Attached to the 3Q24 Report were certifications pursuant to SOX signed by Defendants Ferraro and Martins attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

37.     The 3Q24 Report included a substantively similar description of the Company's strategy as discussed, *supra*, in ¶ 25, and substantively similar generic,

catch-all warnings that were not tailored to Defendants' actual known risks, as discussed in ¶ 30.

38.    On the same day, Avis Budget hosted its Q3 2024 Earnings Call. Defendant Ferraro made the following statement on this call:

> So to recap, we reported a strong third quarter with improved vehicle utilization through ongoing fleet discipline. Our model year 2025 buy is largely complete, and we expect to have substantially lower holding costs as these vehicles rotate on our fleet. We'll continue to prioritize high-margin business while balancing volume.

39.    Defendant Martins made the following statement on the call, in relevant part:

> Our model year 2025 fleet purchase is more affordable. Since we are largely complete with our negotiations, we can say holding costs should improve. We believe over time, our depreciation rate will return to historic levels as we rotate out of the older fleet, which we purchased during the supply-constrained pandemic years and in fleet the model year 2025, which represents a more normalized fleet buy.

40.    Conspicuously, the foregoing positive statements regarding the rotation of model year 2025 vehicles into the Company's fleet failed to acknowledge the likelihood of Avis Budget recognizing a significant impairment charge in the near future.

41.    The statements in ¶¶ 23-40, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Avis Budget crafted and implemented a plan to

significantly accelerate its fleet rotation in the fourth quarter of 2024; (ii) the foregoing acceleration shortened the useful life of the majority of the Company's vehicles in the Americas segment, thereby reducing their recoverable value; (iii) as a result, Avis Budget would be forced to recognize billions of dollars in impairment charges and incur substantial losses; (iv) all the foregoing was likely to, and did, have a significant negative impact on the Company's financial results; (v) accordingly, Avis Budget's financial and/or business prospects were overstated; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

42.     On February 11, 2025, Avis Budget issued a press release reporting its financial results for the fourth quarter and full year 2024. The press release stated, in relevant part:

> We ended 2024 with fourth quarter revenues of $2.7 billion, driven by strong leisure holiday travel. ***Net loss was nearly $2 billion, and Adjusted EBITDA[] was a loss of $101 million***. Full year revenues were $11.8 billion, driven by sustained year-over-year demand. Net loss was $1.8 billion, and Adjusted EBITDA was $628 million.
>
> ***Our net loss and Adjusted EBITDA results reflect a change in strategy to significantly accelerate fleet rotations, which resulted in shortening the useful life of the majority of our vehicles in the Americas segment. The financial impact of this decision was a one-time non-cash impairment of $2.3 billion and other non-cash related charges of $180 million***.
>
> *        *        *

**Avis Budget Group, Inc.**
**SUMMARY DATA SHEET (Unaudited)**
**(In millions)**

| | | Three Months Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2024 | 2023 | % Change | |
| **Income Statement and Other Items** | | | | | |
| Revenues | $ | 2,710 | $ 2,764 | (2)% | $ |
| Income (loss) before income taxes | | (2,841) | 162 | n/m | |
| Net income (loss) attributable to Avis Budget Group, Inc. | | (1,958) | 259 | n/m | |
| | | | | | |
| Adjusted EBITDA(a) | $ | (101) | $ 311 | n/m | $ |

**Avis Budget Group, Inc.**
**CONSOLIDATED STATEMENTS OF OPERATIONS (Unaudited)**
**(In millions, except per share data)**

| | | Three Months Ended December 31, | | |
|---|---|---|---|---|
| | | 2024 | 2023 | |
| **Revenues** | $ | 2,710 | $ 2,764 | $ |
| | | | | |
| **Expenses** | | | | |
| Operating | | 1,563 | 1,350 | |
| Vehicle depreciation and lease charges, net | | 801 | 582 | |
| Selling, general and administrative | | 312 | 309 | |
| Vehicle interest, net | | 217 | 223 | |
| Non-vehicle related depreciation and amortization | | 60 | 53 | |
| Interest expense related to corporate debt, net: | | | | |
| Interest expense | | 92 | 75 | |
| Early extinguishment of debt | | 18 | 4 | |
| Long-lived asset impairment and other related charges | | 2,470 | — | |
| Restructuring and other related charges | | 14 | 4 | |
| Transaction-related costs, net | | 1 | 2 | |
| Other (income) expense, net | | 3 | — | |
| Total expenses | | 5,551 | 2,602 | |
| | | | | |
| **Income (loss) before income taxes** | | (2,841) | 162 | |
| Provision for (benefit from) income taxes | | (884) | (98) | |
| **Net income (loss)** | | (1,957) | 260 | |
| Less: Net income attributable to non-controlling interests | | 1 | 1 | |
| **Net income (loss) attributable to Avis Budget Group, Inc.** | $ | (1,958) | $ 259 | $ |
| | | | | |
| **Earnings (loss) per share** | | | | |
| Basic | $ | (55.66) | $ 7.18 | $ |
| Diluted | $ | (55.66) | $ 7.10 | $ |

43.    In addition, the press release also announced that Defendant Ferraro "will transition from CEO to Board Advisor, effective June 30, 2025" and that "Brian Choi, the Company's Chief Transformation Officer, will take over as CEO, effective July 1, 2025."

44.    On this news, Avis Budget's stock price fell $6.12 per share, or 6.82%, to close at $83.59 per share on February 11, 2025

45.    On February 12, 2025, subsequent to the Class Period, Avis Budget hosted the Q4 2024 Earnings Call. During the Q&A portion of the Q4 2024 Earnings Call, Defendant Ferraro indicated that the Company was aware that accelerating fleet rotation would likely result in a significant impairment charge. Specifically, when asked to discuss the normalizing price levels of vehicles model year 2025, Defendant Ferraro responded, in relevant part, "I can only comment on what we're trying to do as far as our fleet rotation. None of us took that impairment slightly, *and we thought long and hard about it*."

46.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

47.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Avis Budget securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

16

48.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Avis Budget securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

49.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Avis Budget securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

53.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Avis Budget securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- As a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

54.    Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly

available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

55.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

56.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading.

59.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

60.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control

over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

61.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Avis Budget personnel to members of the investing public, including Plaintiff and the Class.

62.     As a result of the foregoing, the market price of Avis Budget securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Avis Budget securities during the Class Period in purchasing Avis Budget securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

63.     Had Plaintiff and the other members of the Class been aware that the market price of Avis Budget securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which

Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

64.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

65.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Avis Budget securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

66.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

68.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public

statements issued by the Company which had become materially false or misleading.

69.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

70.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of

the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 18, 2025

**THE ROSEN LAW FIRM, P.A**
/s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*